IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ESCOLASTICO DE LEON-GRANADOS,　　*
ISAIAS PROFETA DE LEON-GRANDADOS　*
and ARMENIO PABLO-CALMO　　　　　*
on behalf of themselves and all others　　*
similarly situated,　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　Plaintiffs,　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　　　　*　CASE NO.: 1:05-CV-1473
　　　　　　　　　　　　　　　　　　*
ELLER AND SONS TREES, INC. and　　*　　　JURY DEMAND
JERRY ELLER　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　Defendants.　　　　　　　　*

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE PLAINTIFFS' EXPERT WITNESS JORGE RIVERO

COME NOW, Eller & Sons Trees, Inc. and Jerry Eller ("Defendants"), and move to Strike Plaintiffs' Expert Witness Jorge Rivero and his Expert Witness Report[1] pursuant to Rule 702 and 403 of the Federal Rules Evidence. As demonstrated below, Plaintiffs have failed to carry their burden of meeting the stringent threshold requirements for admissibility of Mr. Rivero as an expert witness: the methodologies utilized in his Expert Report are unreliable and not generally accepted in his professed

---

[1] Entitled "Analysis and Report under the Fair Labor Standards Act and the Migrant and Seasonal Agricultural Workers Protection Act" prepared by Jorge J. Rivero dated August 8, 2007 (hereinafter referred to as "Expert Witness Report" or "Report"). Doc. 194, Pls Ex. 144.

field of expertise; many of his findings and conclusions are not based upon the facts of the case or his personal knowledge and are otherwise cumulative; and his underlying assumptions are unfounded and fall within the general scope of common knowledge. Therefore, this Court is obligated under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590-93 (1993) and its inherent gatekeeping authority to exclude Mr. Rivero and his Expert Report as they fail to assist the trier of fact and has the serious potential to mislead or confuse, thus making any probative value derived from Mr. Rivero's opinions and conclusions substantially outweighed by its prejudicial effect.

## **INTRODUCTION**

Plaintiffs designated Jorge J. Rivero as one of their Expert Witnesses for this case and furnished his corresponding Expert Witness Report to Defendants on or around August 8, 2007.[2]  In his report, Mr. Rivero was called upon by Plaintiffs to review Defendants' payroll records to determine the veracity of the daily time sheets maintained by Defendants under the Fair Labor Standards Act ("FLSA") and the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA").  (Report at 1).[3]

---

[2]Plaintiffs identified and submitted the Expert Report by Mr. Rivero a few days before the expiration of the deadline to submit expert witnesses.

[3]Attached to the Report as Exhibit C is a list of Defendants' daily sheets broken down by crew supervisor which Mr. Rivero claims to have utilized in

As part of his analysis, Mr. Rivero also reviewed and considered the original complaint filed by Mr. De Leon-Granados and the Deposition Testimony of Ron Oxentenko.  (Report at 3).  However, Mr. Rivero does not indicate in his report whether he interviewed or reviewed the depositions or affidavits of any Plaintiffs or other workers that were employed by Defendants during the pertinent time period regarding hours worked issues.  Also, Mr. Rivero did not talk with or review the depositions of any Defendants, Regional Directors, crew leaders or other employees regarding recordkeeping policies and practices at Eller & Sons Trees.  Mr. Rivero asserts that he is qualified to review Defendants' payroll records and is competent to render opinions regarding the accuracy of such records based upon his 26 years of experience with the United States Department of Labor, Wage and Hour Division (WH).  (Report at 1).

Based on this experience and analysis of selected records,  Mr. Rivero concludes "Defendants failed to maintain and preserve an accurate record of the total daily and weekly hours worked by the Plaintiffs and other employees...[t]he records in this case clearly demonstrate patterns and practices, time conflicts and inconsistencies, and alterations that support my conclusion that they are not accurate

---

preparing his expert report.  The list is six pages in length and contains approximately 2500 daily sheets.  This list is attached to this brief as Ex. A.

with regards to the number of hours worked by the Plaintiffs and other workers."
(Report at 22); *see also* Doc. 194, Pls Ex. 144 (Affidavit of Jorge J. Rivero ¶ 7).  Mr.
Rivero concludes that Defendants failed to meet their recordkeeping obligations under
FLSA and the AWPA.  (Report at 4 and 22).  Not surprisingly, Plaintiffs extensively
relied on the opinions and findings contained within Mr. Rivero's expert report to
support their Motion for Partial Summary Judgment on AWPA Recordkeeping
violations (Doc. 208-2) and their Statement of Undisputed Facts Nos. 437-468 (Doc.
209).[4]

While Defendants do not dispute Mr. Rivero's qualifications and expertise on
FLSA and MSPA compliance, Mr. Rivero's expert report should be stricken because
it was the product of unreliable methodologies, unsubstantiated facts and unfounded
assumptions.  His unorthodox methods and questionable assumptions do not comport
with the essential threshold requirements for admissibility of expert opinions and any
probative value of his findings substantially outweighed by the danger of prejudice.
As a result, and based upon the important gatekeeping function courts serve in
evaluating experts under Rule 702 and 403 of the Federal Rules Evidence, this Court
should strike Mr. Rivero as an expert witness in this matter and his report should be

---

[4]Defendants have disputed the inclusion of Plaintiffs' expert's conclusions in
Plaintiffs' statement of undisputed material facts in other pleadings.  *See* Docs. 279
and 316.

excluded from consideration on Plaintiffs' Motion for Partial Summary Judgment.

## ARGUMENT AND CITATION TO AUTHORITY

### A.    Standard for Admissibility of Expert Witness Testimony

In light of <u>Daubert</u> and its progeny, the 11th Circuit has employed a rigorous

three-part inquiry to determine the admissibility of expert testimony under Rule 702:

> "the proponent of the testimony must show that: (1) the expert is qualified to
> testify competently regarding matters he intends to address; (2) the
> methodology by which the expert reaches his conclusions is sufficiently
> reliable; and (3) the testimony assists the trier of fact, through the application
> of scientific, technical, or specialized expertise, to understand the evidence or
> to determine a fact in issue."  *See* <u>U.S. v. Frazier</u>, 387 F.3d 1244, 1260-1261
> (11th Cir. 2004); <u>Maiz v. Virani</u>, 253 F.3d 641, 665 (11th Cir. 2001).

The burden of establishing qualification, reliability, and helpfulness always rests on

the proponent of the expert opinion and while there is inevitably some overlap among

these basic requirements, they remain distinct concepts and courts must take care not

to conflate them.  <u>Frazier</u>, 387 F.3d at 1260-1261 (*citing*  <u>Quiet Tech. DC-8, Inc. v.</u>

<u>Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340-1341 (11th Cir. 2003)).  Thus, "while

an expert's overwhelming qualifications may bear on the reliability of his proffered

testimony, they are by no means a guarantor of reliability.... [O]ur caselaw plainly

establishes that one may be considered an expert but still offer unreliable testimony."

Id. at 1261 ("under Rule 702, the reliability criterion remains a discrete, independent,

and important requirement for admissibility") (*citations omitted*).[5]  Even where a

proposed expert satisfies the qualification, reliability, and helpfulness criteria, courts

may still exclude otherwise relevant expert testimony under Rule 403 if the "probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury, or by considerations of undue delay, waste of time, or

needless presentation of cumulative evidence."  Fed.R.Evid. 403.      The district

court has broad discretion in determining whether to admit or exclude expert

testimony, and its decision will not be disturbed on appeal unless it is manifestly

erroneous.  Frazier, at 1258-1259 (abuse of discretion standard) (*citing* Gen. Elec. Co.

v. Joiner, 522 U.S. 136, 142-143 (1997)).

**B.     The Methodologies Utilized By Mr. Rivero In His Expert Report Are
         Unreliable And Do Not Meet Up To His Own Professional Standards**

While Mr. Rivero's credentials are quite lengthy and impressive, the

methodologies and assumptions he applied to a small slice of Defendants' payroll

records and his resulting conclusions are wholly unreliable and not consistent with the

---

[5]*See also* Fed.R.Evid. 702 Advisory Committee's Note (2000 Amends.) ("the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'") *citing* Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under Daubert, that's not enough.").

standards on which he bases his experience.  First, the minimal records he relied upon do not support the broad conclusions he declares.  Second, his analysis is based on assumptions which are not supported by the facts in the record or his experience, undermining the reliability of his ultimate conclusions.  Finally, and related to the first two points, his methodology are not consistent with generally accepted standards which can be expected of a competent Wage Hour Investigator.

### 1.    Mr. Rivero's review of the facts and records was inadequate

The relevant payroll records in this case are quite extensive.  As it has been previously noted, Defendant Eller & Sons Trees fielded approximately 30 to 40 crews at the height of each season during the pertinent time frame, with roughly over 4000 employees altogether on approximately 250 crews reporting to well over 75 different crew leaders throughout the planting seasons.  (Doc. 276: Defs Resp to Pls Part Summ Judg on Recordkeeping Violations at p. 3).  As a result, the approximate number of relevant daily sheets that recorded hours and piece rate information for the workers has been calculated to be well in excess of 50,000 documents.  Id.  In response to this Court conditionally granting class certification in this case, Defendants have produced all of these relevant daily sheets to Plaintiffs along with other pertinent records.  In addition, Defendants, its designated agents and employees, three regional directors and fifteen crew leaders have been deposed in this action, not to mention the four

Plaintiffs, seven Opt-In Plaintiffs and two contractors that have also been deposed. As demonstrated by the records and testimony, there were different methods used for completing the daily sheets and recording the hours worked and production rates for the workers.[6]

Despite the overwhelming number of payroll-related records that have been produced, the numerous deposition testimony taken of Plaintiffs, Defendants, crew leaders, regional directors and contractors, and other available witnesses and records in this case, Mr. Rivero was content in his expert report to rely solely on approximately 2500 daily sheets, the original compliant filed by Plaintiffs containing their unsubstantiated claims, and just one deposition transcript, that of Mr. Ron Oxentenko.  (Report at 3 and Ex. C).[7]  In total, the number of daily sheets considered

---

[6]*Compare* Exs. B, C, D, E, F, G, H, I and J (various daily sheets with some showing individual, only crew or no start/stop times (only total hours); variations in method of recording seedlings and pick up times); *see also* Doc. 209: Pls' Fact Nos. 332-333, 344-435, 495-628 (generally discussing various recordkeeping methods and hours worked); I. Recinos Dep. at 81-82 (some workers would stop at different times) and 91-93 (gives additional time to workers that helped at cooler); E. Garcia Dep. at 45 (started time at prayer); A. Villatoro Dep. at 77 (added time to workers), 25 (crew wrote down start/stop times); O. Recinos Dep. at 130-131 (rounded up the time worked by his workers).

[7]In a follow-up letter, Plaintiffs provided Defendants with 15 CD disks containing approximately 90,000 records which Plaintiffs assert were additional files reviewed by Mr. Rivero.  (Records stamped ES2-000001 to ES2-090126). Out of these 90,000 records, many were not daily sheets or were simply weekly summaries of the same information contained within the daily sheet.  *See e.g.* Ex.

by Mr. Rivero only accounts for a tiny fraction of the available payroll records at issue in this case.   On the basis of less than 1% of the relevant records, self-serving allegations in the Complaint (which are patently not evidence), and one deposition transcript, Mr. Rivero confidently proclaims in his expert report that Defendants failed to meet their recordkeeping obligations under FLSA and AWPA for all years pertinent to Plaintiffs' lawsuit.   Such a broad and inadequately supported declaration is simply not consistent with the methodologies and techniques of a Wage Hour Investigator[8] on which he bases his expertise and certainly does not satisfy the reliability prong of expert admissibility.

Not only did Mr. Rivero rely on only a small slice of the available data, he completely disregard contrary testimony from Defendants' crew leaders discussing hours worked by the crews, how time was actually kept in the field and explanations for inconsistencies or errors in the records.[9]   The sole deposition transcript reviewed by Mr. Rivero was only related to the compensation system for supervisors and

---

K: ES2-037350, 037359, 051085-86, 053303 and 063538 (weekly summaries, contracts and various labels unrelated to Mr. Rivero's analysis).  In addition, and as demonstrated in the following sections, Mr. Rivero's analysis only focused on daily sheets that supported his assumptions and conclusions while completely ignoring daily sheets that contradicted his opinions.

[8]*See* Sec. B, 3 *infra*.

[9]*See* Sec. C, 2, *infra*.

regional directors.[10]  Likewise, Mr. Rivero did not personally observe the work habits

and recordkeeping methods of Defendants' crews from which he bases his ultimate

conclusions in his report.[11]  Without an adequate investigation into such matters or a

sufficient explanation in his report, one is left to wonder how Mr. Rivero was able to

interpret Defendants' somewhat complicated and varying daily sheets.  No where in

his report does Mr. Rivero explain how he was able to understand the various numbers

in the boxes on the daily sheet, how the tree figures and pickup times were handled,

---

[10]Of course, Defendants deny any assertion that its compensation system for supervisors and regional directors promoted the falsification of hours worked.  *See* Eller and Sons Trees 2d Dep. at 50 (bonus system gives incentive to work harder, not falsify hours).  In any event, such generalized conclusions about the effects of a certain compensation system and motivations of individuals lacks any factual foundation and is within common knowledge, making such expert testimony unnecessary especially since it has the tendency to unfairly persuade.  *See* Sec. C, 1, *infra*.

[11]*See* Sec. B, 2 and C, 1-2, *infra*.  The specific work habits of the workers and the particular recordkeeping methods of the crew leaders are clearly observable facts which have been introduced in this case through first-hand deposition testimony and payroll records.  Since many of Mr. Rivero's observations and assumptions are not based upon his personal knowledge but rather were indirectly derived from these other cumulative sources of information already before this Court, his opinions are due to be struck under Fed.R.Evid. 602 (testimony requires personal knowledge) and 801-807 (exclusion of hearsay).  *See* Thomas v. Evenflo Co., Inc., 205 Fed.Appx. 768, 772 (11th Cir. 2006) (expert's opinion regarding cause of death not based upon personal knowledge of observable facts but rather were indirectly derived from other cumulative information; thus testimony did not assist trier of fact and was properly excluded).  In addition, allowing Mr. Rivero to opine on issues central to this case giving the impression that he was personally there would be misleading and unduly persuasive.  Id. (*citing* Fed.R.Evid. 403).

how start/stop times and total hours were recorded and how different crews recorded such information.

Mr. Rivero only utilized a statistically inadequate amount of payroll records to support his astoundingly broad conclusion that all of Defendants' daily sheets were falsified.  While Mr. Rivero certainly could point out certain patterns and practices observed from the particular daily sheets he reviewed, he has utterly failed to provide any basis, experience or otherwise, from which to extrapolate his limited findings to the entire universe of Defendants' payroll records.  There is simply no justification in extending his speculative conclusions from less than 1% of Defendants' payroll records to the other 99% of the records covering multiple years, dozens of crew leaders, and hundreds of workers.[12]  Moreover, Mr. Rivero has completely failed to show how his experience justifies many of the underlying assumptions he uses in analyzing Defendants' payroll records which were crucial to his ultimate conclusions but which were not premised upon any actual facts of this case.[13]

---

[12]For example, Mr. Rivero only utilized about 25 daily sheets for Ismael Recinos, one of Defendants' crew leaders that has worked with Eller & Sons Trees for over 18 planting seasons.  *Compare* Ex. A (Report at Ex. C) *with* Recinos Dep. at 38.

[13]*See* Sec. B, 2 , *infra*.  In addition, to the extent that Mr. Rivero's assumptions and observations are within the common knowledge and are based upon records already in evidence, his testimony is cumulative and does not assist the trier of fact.  Sec. C, 1-2, *infra*.

Worse yet, Mr. Rivero selected only those daily sheets which supported his assumptions and conclusions, while ignoring many others that contradicted his opinions. For example, after setting forth his unsupported assumption that all piece workers will work as long as possible and that the crew should normally work identical hours, Mr. Rivero points to various daily sheets that reflect variations in the hours worked which he asserts demonstrates that the records have been falsified. (Report at 4-6). In truth, these records demonstrate only that they do not fit Mr. Rivero's preconceived ideas: it takes more than that to prove that the records themselves are inaccurate. However, there are multiple examples of other daily sheets for the same crew leaders dated before and after the sheets cited by Mr. Rivero that credit the entire crew with the same amount of work hours for the day.[14] Similarly, and in stark contrast to his assumptions and limited cited examples which Mr. Rivero claims shows that the records are inaccurate, there are plenty of daily sheets that show seedling pickup times at or after the start of the day, varying pickup times between the

---

[14]*Compare* Ex. J: ES2-030803-04 (daily sheets for supervisor Hiram Edison Guerra y Guerra cited at Report at 5 showing variations in hours worked by crew) *with* ES2-030791-92, 030805-08 and 030845-46 (daily sheets for supervisor Hiram Edison Guerra y Guerra showing the same hours worked by the entire crew with either only one or half an hour for lunch or no lunch break at all); *compare also* Ex. I: ES2-037365-66 (daily sheets for supervisor Ismael Recinos cited at Report at 6 showing at most one hour variations in time worked by crew) *with* ES2-037362-63, 037367-68 and 037373-74 (daily sheets for supervisor Ismael Recinos showing the same hours worked by the entire crew with only one hour lunch break).

crew, short or no lunch breaks, varying production rates in the same hours of work, etc.[15]  For example, Mr. Rivero cites to one daily sheet for supervisor Hector Castillo showing start time at 12 noon but with seedling pickup times anywhere from 8 to 9 a.m. (Report at 13; Ex. B: ES2-064284-85).  Yet daily sheets from the same time period for this crew leader show varying seedling pickup times that directly relate to the start times recorded by the workers.  (Ex. B: ES2-064278-79: start time listed as 8:30 with initial pickup times varying from 8:38, 8:45, 8:46, 8:50 and 8:56 with no lunch break for the entire crew; *see also* ES2-064280-83).  What these examples demonstrate is that there are numerous daily sheets which do not validate with the assumptions used by Mr. Rivero:  they do not support the conclusion that Defendants' records are inaccurate or have been falsified.  Mr. Rivero's selective use of certain daily sheets gives an inaccurate and misleading picture of Defendants' records and renders his report unreliable.

Mr. Rivero's insufficient review of Defendants' records also casts doubt on his blanket statements about what 'often' or 'frequently' occurred on such pay records.

---

[15]*Compare* Report at 8-15 (citing daily sheet examples of same trees planted in the same hours among the crew, long and multiple lunch breaks, many workers with identical seedling pickup times and seedling pickup times before listed start time as evidence of falsification or inaccurate records) *with* Exs. B, C, D, E, F, G, H, I and J (daily sheets showing consistent hours worked among the crew, different trees planted in the same hours, short or no lunch breaks, varying seedling pickup times and seedling pickup times at or after listed start time).

For example, Mr. Rivero concluded that:

- "Defendants would *often* show employees with lower seedlings planted with respectively lower hours...Defendants would *often* show the employees with the lower seedlings planted either starting work later or finishing work earlier" (Report at 5-emphasis added);

- "daily sheets *often* show employees who finished earlier than the rest of the crew with the same number of seedlings planted" (Report at 8-emphasis added);

- "time records kept by Defendants *frequently* show unusually long lunch breaks" (Report at 9-emphasis added); and

- "alterations are *almost always* in the employer's favor" (Report at 18-emphasis added).

Not only are such overly broad assertions directly contradicted by some of the daily sheets reviewed by Mr. Rivero,[16] it is simply untenable to assert what 'often' or 'frequently' occurred from the basis of a tiny fraction of Defendants' daily sheets.

---

[16]*See e.g.* Ex. D (Daily Sheet labeled ES2-031110): first seedling pickup time coincides with start time listed, every worker credited with same hours worked despite variations in trees planted, different seedling pickup times; Ex. E (Daily Sheet labeled ES2-031011 and 031012): every worker credited with same hours worked despite variations in trees planted, worker Hipolito Ramirez Martinez planted 2475 trees and was credited with same hours worked as Oziel Perez Morales who planted 3913 trees, only a half hour for lunch; Ex. F (Daily Sheet labeled ES2-084208 to 084210) same hours worked by entire crew with variations in trees planted, no lunch break; Ex. G (Daily Sheet labeled ES2-087700and 087701) variations in hours worked and trees planted, workers with less hours planted less trees, no lunch break; Ex. H (Daily Sheet labeled ES2-030876 and 030877) variations in hours worked and trees planted, workers with less hours planted less trees.

In other words, Mr. Rivero has failed to demonstrate that his findings are based upon sufficient facts or that his conclusions are properly grounded and well-reasoned.[17]  Because Mr. Rivero's findings are highly speculative and based upon an extremely limited review of the evidence, his testimony and expert report are not sufficiently reliable and should be excluded.

### 2.    Mr. Rivero's assumptions and conclusions lack an adequate factual basis

Even assuming that Mr. Rivero is competent and qualified to render opinions regarding FLSA and MSPA compliance, many of the underlying assumptions and conclusions in his expert report are completely unsupported by any facts in the record. For example, Mr. Rivero makes the following observations:

- "Piece rate workers will *typically* work as long as possible in any given workday so that they may increase their earnings." (Report at 4) (emphasis added);

- "You don't *normally* see a wide variation (an hour or more) in the hours worked for field workers working in the same crew, performing the same work, and paid on a piece rate basis."  (Report at 4) (emphasis added);

- "When production by slower employees is not sufficient to cover the minimum wage or the H-2B prevailing wage for the hours worked, employers *may* resort to various methods to evade the  minimum wage or prevailing wage requirements" (Report at 5) (emphasis added);

_____

[17]*See* Fed.R.Evid. 702 Advisory Committee's Note (2000 amends.) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.").

- "The most common method utilized for piece workers is to under-report the hours worked." (Report at 5);

- "The high number of employees shown working fewer hours than their co-workers, if true, would indicate many hours of lost production time.  It is *not believable* that Defendants would allow such a practice." (Report p. 6) (emphasis added);

- "The total hours worked [on Defendants' daily sheet records] is shown either to the whole or half hour.  This is indicative that records are not accurate...It is *highly unlikely* that a crew would always arrive at a field on the hour or half-hour.  It is even *more unlikely* that an entire workforce working in various fields and throughout various states would start and stop working on the hour or the half hour all or nearly all the time." (Report p. 7) (emphasis added);

- "The goal of the employee paid on a piece rate...is to produce as much as possible" and that a typical employee "takes very little time for lunch, no more than half an hour, and many times eats as he/she works." (Report at 9);

- "[C]ompensation system [used for crew leaders and regional directors] creates a tremendous incentive for the crew supervisor to conceal or underreport the number hours worked by the employees." (Report at 19-20).

Upon these extensive and overarching assumptions, Mr. Rivero claims that he was able to affirmatively conclude that all of Defendants' payroll records were falsified and thus in violation of the FLSA and AWPA recordkeeping provisions. (Report at 4 and 22).  In essence, Mr. Rivero compared a small sampling of Defendants' daily sheets to these preconceived assumptions to conclude that the records and hours must be inaccurate.  For example, if the daily sheets showed workers taking long lunch breaks or taking off early, Mr. Rivero would contend that

such records are false since "piece rate workers will typically work as long as possible" and that it is "not believable" that Defendants would allow such "lost production time."  Likewise, low hours and long breaks, any corrections to the time records and variations in hours worked among the crew must be directly related to the wilful actions of Defendants, their crew leaders and regional directors to manipulate and falsify the records because there is a natural incentive to increase profits and evade the minimum wage or prevailing wage requirements.

While these propositions are superficially plausible and were stated authoritatively, Mr. Rivero fails to support them with any actual facts developed during the course of his investigation.  Mr. Rivero did not personally observe Defendants' workers out in the field, and has no basis upon which to make generalized conclusions about their particular work habits.  He does not know, but only assumes, when workers would typically start and end their day, how many breaks they would take and the duration of such breaks, the eating habits of the workers, the extent that some workers may group together and work similar hours, or other factors that may significantly affect the work schedule such as weather and ground conditions, available sunlight, fatigue, etc.  Similarly, without actually talking to or at least reviewing the deposition transcripts of the crew leaders or regional directors, Mr. Rivero is not competent to make assertions regarding their recordkeeping practices or

motivations.  Moreover, Mr. Rivero has failed to explain how he was able to interpret the information contained within the daily sheets upon which he bases his findings and conclusions.  We are left to conclude that he just made educated guesses on what the numbers on the daily sheets represented and how they were complied using his unsubstantiated assumptions.  The lack of such a basic factual foundation undercuts the reliability of Mr. Rivero's opinions and fails to provide something beyond the understanding of the average person.  This Court and the trier of fact can just as easily review Defendants' daily sheets and make the same comparisons and conclusions regarding start/stop times, lunch breaks, variations in hours worked, etc. as made by Mr. Rivero based upon the available evidence and common knowledge.

Mr. Rivero has also failed to demonstrate how his background experience justifies the wholesale application of these assumptions to Defendants' payroll records.  In fact, his observations that employees want to work as much as possible to increase earnings and that employers want to limit labor cost which may lead some to under report hours are not based upon any specialized knowledge or experience but rather are simply part of common knowledge, and are appropriately within the province of the jury, not an expert.[18]

---

[18]To the extent that Mr. Rivero's assumptions and observations are within the common knowledge and are based upon records already in evidence, his testimony is cumulative and does not assist the trier of fact. Sec. C, 2, *infra*.

Mr. Rivero turned a blind eye to any alternative explanations to his findings and completely disregarded record evidence that was inconsistent with his conclusions.[19] This calls into question the reliability his expert report.[20]  For example, Mr. Rivero assumed that when lower hours were reported for certain workers who planted fewer trees, that was the result of a fraudulent reduction of hours by Defendants in a concerted effort evade the minimum and prevailing wage requirements for these "slow planters."  (Report at 5 and 9-12) ("Defendants would often show employees with lower seedlings planted with respectively lower hours than their higher producing coworkers").  Not only is this proposition contradicted by some of Defendants' own records showing identical hours worked with variations in trees planted among the crew, it fails to account for the obvious and natural correlation between hours worked and trees planted – the more hours you work, the more trees you will likely plant.

---

[19]See FN 16, *supra*. (sample daily sheets reviewed by Mr. Rivero contradict some of his unfounded assumptions: first seedling pickup time coincides with start time listed; workers credited with same hours worked despite variations in trees planted; entire crew credited with same hours worked on certain days; different seedling pickup times; only a half hour for lunch and sometimes no lunch break at all; workers with less hours planted less trees).

[20]See Fed.R.Evid. 702 Advisory Committee's Note (2000 amends.) (Whether the expert has adequately accounted for obvious alternative explanations is one factor to consider in determining the reliability of the expert testimony) (*citing* Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition)).

Thus, showing fewer hours worked for workers with lower tree totals does not necessarily support the conclusion that their hours were altered or that they were recorded as taking longer breaks that they actually took; it may simply mean that the worker worked fewer hours than others on his crew and thus ended up planting less.[21] Mr. Rivero cannot admit this possibility because it is inconsistent with his preconceived notion that the Defendants are intent on cheating the workers, but this lack of objectivity erodes the credibility of his report.  Finally, Mr. Rivero's failure to impartially review and render findings based upon the actual facts developed during his investigation are not consistent with the methodologies upon which he basis his qualifications.[22]

Of course, Mr. Rivero was capable of reviewing and rendering opinions on the patterns and practices he observed from Defendants' payroll records.  However, by beginning his analysis with preconceived notions that formed the basis of his ultimate

---

[21]This is also consistent with supervisor testimony regarding variations in hours worked and trees planted which was not considered by Mr. Rivero in his expert report.  *See* I. Recinos Dep. at 81-82 (some workers would stop at different times) and 91-93 (gives additional time to workers that helped at cooler); I. Recinos 2d Dep. at 100-102 (some workers take off early); E. Garcia Dep. at 54-60 (some workers would take longer breaks and thus plant less; variations in hours worked by crew); A. Villatoro Dep. at 90-91 (some workers took longer breaks and planted less); O. Recinos Dep. at 94-95 (different breaks taken) and 99-101 (crew works different times).

[22]*See* Sec. B, 3, *infra*.

conclusions, the credibility of Mr. Rivero's entire expert report is compromised.  Mr. Rivero may have previously experienced situations of long hours worked by employees and underreporting by employers during his time with the U.S. Department of Labor, but he has not justified the automatic imposition of such assumptions to the case at hand.

Mr. Rivero's failure to lay down a reliable foundation for his assumptions is very similar to the situation addressed in <u>Frazier</u> where the court affirmed the exclusion of certain portions of expert testimony.  In <u>Frazier</u>, the court found that the expert was qualified and could explain the standard procedures employed in investigating the crime scene of a sexual assault.  <u>Frazier</u>, 387 F.3d at 1254-55. However, the expert was not allowed to opine that about what one would be *expected* to find in the course of such an investigation, or to conclude that the absence of such evidence would suggest that no assault had occurred.  The Court rejected that portion of the expert's opinion because such findings were "imprecise and unspecific" and the expert failed to demonstrate how his previous experience provided a reliable foundation for his assumptions.  Id. at 1264-66 (expert never explained just how his own experience supported his "expectancy" opinion: "the methodological foundation or reliability of...[his] opinion was sufficiently slender to allow the district court to conclude that the trier of fact would not be assisted by the opinion.").

In a similar case, the 11th Circuit upheld a decision by the district court to exclude the entire expert opinion which concerned matters that were within the understanding of the average lay person and which had no factual foundation.  <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.</u>, 402 F.3d 1092, 1111-1113 (11th Cir. 2005).  In <u>Cook</u>, the district court found the following expert testimony inappropriate and thus properly excludable:

- opinion that defendant's procedures failed to identify suicidal tendencies was established through other testimony, did not involve scientific, technical, or other specialized knowledge, and offered nothing beyond the understanding and experience of the average citizen;

- no factual support that victim should have been put on suicide watch and observation that hourly checks were insufficient was within understanding of the average layperson;

- opinion that suicide prevention training was inadequate was without factual foundation-it did not set forth generally accepted standard for suicide prevention training in jails or how or why defendant's training was inadequate; thus, this opinion was "connected to existing data only by the *ipse dixit* of the expert" (*citations omitted*);

- opinion that with proper psychiatric treatment, victim probably would not have committed suicide was unsubstantiated and unspecific;

- opinion that the employee should have read the request for a psychiatrist and should have notified the facility "offers nothing more than what lawyers for the parties can argue in closing arguments" (*citations omitted*) and was well within the understanding of the average layperson.  Id.

Like the expert's testimony in <u>Frazier</u> and <u>Cook</u>, Mr. Rivero fails to establish a reliable foundation for his assumptions and conclusions because he is working from

expectations instead of evidence.  He expects that piece-rate workers will always work as many hours as possible, never take breaks together, rarely stop to eat, that employers always are motivated to underreport hours, etc.   Such generalized expectations – prejudices by another name – are simply not supported by any evidence in the record of this case,  and Mr. Rivero has failed to demonstrate how such expectations are reliably based upon his experience.  Here are some of the more egregious examples of unsubstantiated assumptions masquerading as fact in Mr. Rivero's report:

| Page # | Expert Report[23] | Insufficient Basis for Opinion |
|---|---|---|
| 4 and 8 | Piece rate workers will typically work as long as possible; production varies depending on speed of the workers; some workers are faster and thus you will see variations in production for same hours worked | No factual support; imprecise and unspecific assertion well within common knowledge |
| 5 | When no start/end time recorded, Defendants would lower number of hours worked | No factual support for proposition that when no start/end time shown, the hours recorded were less than actual hours worked |
| 6 | Not believable that Defendants would allow lost production time | No factual support; imprecise and unspecific assertion well within common knowledge |

_____

[23] Doc. 194 contains the original language which is abridged here for purposes of this Motion.

| 7 | When records are accurate, you will see range of hours worked; highly unlikely that crew would always arrive on the hour or half hour | No factual support on actual work schedule; imprecise and unspecific assertion well within common knowledge |
|---|---|---|
| 9-11 | Goal of employee is to produce as much as possible; thus, employee either takes very little time for lunch or no lunch at all; Defendants' records of long lunch breaks are atypical for piece rate workers | No factual support that lunch breaks are unusually long or inaccurate; imprecise and unspecific assertion well within common knowledge |
| 9 | Piece rate method is strong motivator for employee to work as fast and as long as possible | No factual support; imprecise and unspecific assertion well within common knowledge |
| 12-13 | Clear that employees began work before the start time indicated on daily sheet and worked after end time | No factual support; imprecise and unspecific assertion well within common knowledge |
| 15 | Start and end time correlated to seedling pickup time; employee showing longer work hours is representative of actual hours for entire crew since typically workers travel together | No factual support and makes unfounded assumption that employee with most recorded hours is representative of actual work hours for crew; imprecise and unspecific assertion well within common knowledge |
| 18 | Alterations to records appear to be done after the fact with purpose to evade overtime requirements | No factual support as to timing and purpose behind making corrections to records; imprecise and unspecific assertion well within common knowledge |

| 19-20 | Compensation system creates a tremendous incentive to conceal or underreport the number hours worked | No factual support; imprecise and unspecific assertion well within common knowledge |
|---|---|---|

Since Mr. Rivero was relying solely on his experience in drafting his expert report, it remained his burden to explain how his prior experience had led to the conclusions he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case. Frazier, 387 F.3d at 1262. As demonstrated above however, many of Mr. Rivero's opinions are unspecific and imprecise with no factual support whatsoever. This Court simply cannot just take Mr. Rivero's word for it that his assumptions and conclusions are accurate and true (*see* Fed.R.Evid. 702 Advisory Committee's Note (2000 amends.)), and it is not enough for such opinions to only be connected to the existing data by the "ipse dixit" of Mr. Rivero. Cook, 402 F.3d at 1111. As such, the analytical gap between Mr. Rivero's opinions and actual facts of the case is simply too great with which to justify the inclusion of his inadequately supported report.

Although Mr. Rivero's assumptions and resulting conclusions are not helpful to resolving the merits of this case, they do reveal his own personal or cultural bias in preparing his report for Plaintiffs. On the one hand, Mr. Rivero views Plaintiffs and other workers as extremely dedicated, highly motivated and almost machine-like: they

always work as hard and as long as possible every single day, morning to night, never taking a break, never getting sick or tired, and rarely even stopping to eat.[24] Conversely, Mr. Rivero ascribes the worst motives and intentions to Defendants, their crew leaders and regional directors: they are deceptive, untrustworthy, greedy, and prone to falsifying records to evade their obligations under the law.

At the same time, in reviewing Defendants' records Mr. Rivero makes all assumptions in Plaintiffs' favor.  For instance, Mr. Rivero always assumes that variations in the hours worked and production by the crew is a concerted effort to underreport hours for slower planters, never that the worker or workers just happen to work fewer hours and plant fewer trees on that particular day. (Report at 4-6).  If on the other hand, workers are shown with the same hours and the same production, Mr. Rivero again concludes that this is indicative of inaccurate records and never that

---

[24]Mr. Rivero curtly dismisses illness or fatigue as an explanation for Defendants' records since he concludes that you would not see workers working the same amount of hours and planting the same amount of trees consistently every day.  (Report at 6).  However, as previously demonstrated, Defendants' daily sheets show both entire crews working the same hours with different production rates and individual workers working less hours than others in the crew with a lower production rate.  *See* FN 16, *supra*.  In addition, Mr. Rivero fails to acknowledge the testimony of the crew supervisors that there were variations in hours worked and breaks taken amongst the crew and that some workers would quit early.  *See* FN 21, *supra*.  Mr. Rivero's failure to consider such factors as an alternative explanation to his conclusions undermines the reliability of his report. *See* Fed.R.Evid. 702 Advisory Committee's Note (2000 amends.).

there is a chance workers may work the same hours and plant similar if not identical numbers of trees.  (Report at 8).  Mr. Rivero also makes the unfounded assumption that if one worker shows an earlier or later start/stop time, that time would be correct and representative of the entire crew since they all arrive and leave the field at the same time.  (Report at 12-15).  Mr. Rivero never concedes that it may be possible that this one lone employee may have incorrectly recorded his time on the daily sheet and that all of the other employees actually wrote down the correct time.  Mr. Rivero also consistently asserts that Defendants' records are flawed (the trees planted, the hours worked, the seedling pickup times, etc. are inaccurate) but then relies on these same numbers to prove that the hours worked are not accurate and to "reconstruct" what he considers to be the actual hours worked by the workers.  (Report at 15: "Although I have little confidence that the seedling pick up times are accurate, in many cases the use of the information provided indicates that the hours worked shown for many workers cannot be accurate").  Finally, Mr. Rivero only considers daily sheets which conform to his preconceived assumptions and ignores those sheets which undercut his argument that all of Defendants' records are falsified or inaccurate.[25]

While it probably should come as no surprise that all of his assumptions and inferences were drawn in his client's favor, it is troubling that Mr. Rivero's entire

_____

[25]*See* FN 14, 15 and 16, *supra*.

report appears to be little more than a complete reiteration of Plaintiffs' allegations in their complaint, deposition testimony and affidavits.  A failure of objectivity brings about a failure of credibility.  In sum, Mr. Rivero's testimony adds absolutely nothing to the arguments Plaintiffs have already made and will make at trial based upon the records and evidence established in this case.   The purported expert report ends up being not much more than a noisy echo of the original Complaint.  Accordingly, this Court is authorized to strike those unsupported and unreliable portions pursuant to Fed.R.Evid. 702(2) and (3).

### 3.    Mr. Rivero's methodologies are inconsistent with cited experience

Mr. Rivero purports to base his analysis and conclusions of Defendants' payroll records on his 26 years of experience with the United States Department of Labor, Wage and Hour Division.  (Report at 1).  However, he fails to show how this experience permits him to reach many of his speculative assumptions and conclusions contained in his report.[26]  In addition, the methodologies utilized and conclusions rendered by Mr. Rivero are not consistent with those of a Wage Hour Investigator.

A Wage Hour Investigator should always begin the investigation by impartially reviewing the employment practices and records at issue.  *See* Ex. L at ¶ 6 (Affidavit of Dan Bremer).  The investigator must base his or her findings on the actual records

---

[26]*See* Sec. B, 2 , *supra*.

available and should not assume facts that are not supported by the evidence.  In addition, the investigator should not let their own personal bias affect the nature and scope of the investigation.  Id.  If questionable patterns or practices are observed from the employment records, the investigator must conduct interviews with the individual employees, supervisors and employers to determine how the records were created and maintained.  Id. at ¶ 7.  The investigator is simply not permitted to substitute his or her own theories or assumptions into the case without conducting a thorough investigation.   At the same time, an investigator cannot render overly broad conclusions based upon a limited analysis of the records.  For example, finding errors or questionable patterns in the employment records for some days for some workers cannot automatically be attributed to all records without the support of additional facts.  Id.

In the instant case, Mr. Rivero's investigation and analysis of Defendants' payroll records do not meet these standard operating procedures.  Ex. L at ¶ 5 and 8-11.  As stated in the preceding sections, Mr. Rivero reviewed a statistically inadequate sample of the available records, he did not interview pertinent witnesses or review their deposition testimony regarding recordkeeping and hours worked and he began his analysis of Defendants' payroll records using speculative assumptions which were not based upon his personal knowledge or the evidence in the case.  Indeed, his

procedures in this case are not even consistent with what he represented as proper investigative techniques in other cases in which he has offered expert testimony.[27]

In sum, Mr. Rivero's testimony and expert report are not the product of the same level of "intellectual rigor" that is supposed to characterize the practices of an ethical and competent Wage Hour Investigator.  <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999) (trial court did not abuse its discretion in excluding expert testimony).  The inadequate methodologies utilized by Mr. Rivero, which fall woefully short of acceptable practices by others in his professed field of expertise, is one more factor that demonstrates the unreliability of his expert report.

## C.    Mr. Rivero's Testimony Will Not Assist The Trier Of Fact

As detailed in the section above, the opinions and conclusions offered by Mr. Rivero are unreliable because they were based upon an insufficient review of the facts, unsupported and speculative assumptions and inadequate methodologies.  As a result,

---

[27]*Compare* Report at 3 ("Material Reviewed and Analyzed"–complaint, small sample of daily sheets and one deposition transcript) *with* the extensive materials reviewed and analyzed by Mr. Rivero in other recent expert reports he has prepared: Ex. M (King v. HomeBanc: reviewed complaint, answer, relevant briefs, company agreements and policies, two depositions, seven affidavits and numerous regulations and Wage Hour Opinion letters), Ex. N (Rodriguez v. Farm Stores Grocery: reviewed complaint, company manuals and performance reviews, nineteen depositions, thirteen affidavits and various regulations and Wage Hour handbook) and Ex. O (Beck v. Boce Group: reviewed payroll records, clock-in/clock-out reports, eighteen depositions and twenty-two supplemental answers to interrogatories).

the ultimate findings in Mr. Rivero's expert report were imprecise and lacking in reliability; thus, it cannot be said that his conclusions would assist the trier of fact.[28] Further, Mr. Rivero's expert report will not serve to assist the trier of fact and should be stricken under Rule 702 because many of his underlying assumptions are within the realm of common knowledge, his testimony is cumulative of other evidence already in the record and his opinions invade the province of the Court and jury by providing legal conclusions.

### 1.    Statements of common knowledge fail to assist trier of fact

Expert testimony is admissible only if it concerns a matter which is beyond the understanding of the average lay person.  Frazier, 387 F.3d at 1262 (*citing* United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen").  Here, many of Mr. Rivero's findings are based upon mere speculation, assumptions and prejudices regarding the nature of work and the generalized motivations of employers and employees, not on any objective facts related to Defendants' actual

---

[28]*See* Frazier, 387 F.3d at 1266 (imprecise and unreliable opinions properly excluded under the third prong of Rule 702 where court determined that it easily could serve to confuse and mislead the jury; court found expert opinion testimony would not assist the trier of fact in understanding the evidence); Thomas, 205 Fed.Appx. at 773 (general conclusions regarding the defectiveness of a product insufficient to assist trier of fact in determining whether that actually contributed to the cause of death).

operations.[29]   None of these statements are premised upon Mr. Rivero's personal knowledge and have not been shown to be derived from his experience.   Rather, his assumption that workers want to make money, may skip breaks to increase production, that it is unlikely to start and end the work day on the hour or half hour, unlikely to have variations in hours worked among the crew and that employers want to increase production while limiting expenses are contentions that lay persons on a jury can evaluate without the expert's assistance.[30]

---

[29]*See e.g.* Report at 4 ("Piece rate workers will typically work as long as possible in any given workday so that they may increase their earnings"..."You don't normally see a wide variation (an hour or more) in the hours worked for field workers working in the same crew, performing the same work, and paid on a piece rate basis."), at 4 ("The production varies depending on the speed of the workers. Some employees are simply faster than others."), at 5 ("employers may resort to various methods to evade the  minimum wage or prevailing wage requirements"), at 6 ("not believable" that Defendants would allow "lost production time"), at 7 ("highly unlikely that a crew would always arrive at a field on the hour or half-hour"), at 8 ("Typically, piece workers will produce at different rates."), at 9 (workers typically take "very little time for lunch, no more than half an hour, and many times eats as he/she works"), at 15 ("arrival time in the field would have been earlier than the first seedling pickup time"), and at 19-20 ("compensation system [used for crew leaders and regional directors] creates a tremendous incentive for the crew supervisor to conceal or underreport the number hours worked by the employees.").

[30]*See e.g.* Evans v. Mathis Funeral Home, Inc., 996 F.2d 266, 268 (11th Cir. 1993) (expert's opinion on cause of fall related to uneven risers and treads, brick patio and steps, height of the handrail and dim light all found to be within the common knowledge of the jurors and thus properly excluded); Morales-Arcadio v. Shannon Produce Farms, Inc., 2007 WL 2106188, 12-13 (S.D.Ga. 2007) (portion of expert testimony stricken where it merely related "logic" and otherwise

The trier of fact can review the witness testimony and the payroll records and draw their own conclusions from the evidence of this case.[31]  Allowing Mr. Rivero to present his opinions, theories, and prejudices will serve only to mislead and confuse the trier of fact who may be tempted to accord undue weight to his testimony because he is offered as an expert, which gives the false impression that he can speak with greater authority about the facts at issue.[32]

### 2. Cumulative and contradicted testimony in expert report is not necessary or helpful

Many of Mr. Rivero's assumptions and conclusions have already been explored during discovery, and in some cases are directly contradicted by the testimony in the record.  This further erodes the value of his report.  For example, Mr. Rivero notes that throughout the records he reviewed there were instances where hours were altered apparently after the fact to bolster his claim that Defendants intentionally concealed hours worked.  (Report at 18-19).  During depositions however, Defendants' payroll

_____

presented legal arguments that were not based upon special knowledge that would be helpful to a jury).

[31]Thomas, 205 Fed.Appx. at 773 (expert's conclusions premised on evidence already before the trier of fact excluded where it was up to the trier of fact to draw similar or differing conclusions based upon the same evidence).

[32]Id. (expert testimony struck where it was cumulative of other evidence and gave the suggestion that expert was present at the incident; thus, testimony did not assist the trier of fact and would be misleading and unduly persuasive).

clerks and other employees testified about making such necessary adjustments to the daily sheets in coordination with the crew leaders and regional directors to correct errors,[33] and such facts have already been introduced as undisputed.[34]  Similarly, Mr. Rivero's observations and assumptions regarding variations in hours worked, start/stop times, breaks taken, work schedules, travel time, incentives, recordkeeping methods, etc. have already been elicited through deposition testimony and affidavits from Plaintiffs' witnesses and have been refuted by Defendants and their crew leaders.[35]  In fact, some of the daily sheets reviewed by Mr. Rivero in preparing his report were examined during the depositions of Defendants' crew leaders, who were

---

[33]Brown Dep. at 26-33; Irwin Dep. at 25-33 and 42-45; Blacquiere Dep. at 18-20, 31-34, 38-40 and 92; Eller Dep. at 233-234.

[34]*See* Doc. 209: Pls' Fact Nos. 329-330.

[35]*See e.g.* Pls' Fact Nos. 332, 344-435, 495-628; Pls Exs. 38 (Isaias Profeta De Leon Granados Affidavit) and 39 (Osmar De Leon-Lucas Affidavit); E. De Leon-Granados Dep. at 51-52 (crew always started and stopped work at the same time every day and that everyone worked the same amount of hours); Armenio Pablo-Calmo Dep. at 47 (same); *contradicted by* Defs Resp to Fact Nos. 332, 344-435, 495-628; I. Recinos Dep. at 81-82 (some workers would stop at different times) and 91-93 (gives additional time to workers that helped at cooler); E. Garcia Dep. at 45 (started time at prayer); A. Villatoro Dep. at 77 (added time to workers), 25 (crew wrote down start/stop times), 44, 84-90 (different workers worked different amounts of time each day and some workers quit early); M. Villatoro Dep. at 50 (work day did not always end for all workers at the same time); O. Matias Dep. at 98 (some workers quit early because they just did not want to work anymore); O. Recinos Dep. at 130-131 (rounded up the time worked by his workers).

able to provide direct explanations on how the records were kept and explain any apparent errors or discrepancies in the records.[36]  Mr. Rivero's conclusions that total hours worked and seedling pick up times cannot be accurate given the apparent planting rates has also been explained and refuted by Defendants' crew leaders.[37]  One crew leader has even asserted that he almost universally would begin work on the hour, which contradicts Mr. Rivero's assertion that it would unlikely or rare for crews to always start and end the day on the hour or half-hour.[38]  In addition, Mr. Rivero

---

[36]For example, *compare* Ex. A: Report at Ex. C at 4 (I. Recinos) *with* Pls Ex. 136 (Pls Ex 10 to I. Recinos 2d Dep: ES2-034553-034555); *see also* Defs Resp to Fact Nos. 332, 344-435, 495-628 (crew leader depositions explaining recordkeeping methods and reviewing and explaining any inconsistencies).

[37]Mr. Rivero uses an average planting rate obtained by dividing the seedlings picked by the number of hours recorded for workers between pick up times. (Report at 15-17).  Upon this formulation, he posits that the stop times cannot be correct since they do not allow the employee enough time to plant all of the seedlings picked according to the average planting rate.  Id. at 15 and Ex. B (Mr. Rivero reconstructed the hours he contends were actually worked based upon average planting rate).  However, Defendants' crew leaders testified and it is undisputed that they would add trees at the end of the day to workers who helped out more during the day.  Pls Fact Nos. 333, 349, 387, 400, 419 and 578.  Thus, the trees recorded on the sheets may in some cases be more than what the worker actually planted, thus rendering Mr. Rivero's average planting rate unreliable.  This also completely undermines his reconstructed hours worked by Plaintiffs based on this average planting rate.  (Report Ex. B).  Of course, Mr. Rivero would have realized this factor had he conducted a proper investigation into Defendants' records and had he reviewed all of the pertinent deposition transcripts before drafting his expert report.

[38]*Compare* Report at 7 *with* E. Garcia Dep. at 377.

mis-characterizes the nature of Defendants' pay records by ignoring daily sheets that do not conform to his assumptions and opinions.[39]  Lastly, Mr. Rivero's assertion that in order for the crew leader and regional director to earn a higher bonus they would need to have the crew produce more in less time (thus creating an incentive to conceal or underreport hours) misconstrues the testimony of Mr. Oxentenko and is in fact directly contradicted by it.[40]

As the examples above demonstrate, Plaintiffs not only had the ability to fully develop and argue their theory of the case regarding hours worked and falsification of the records, they actually have done so through extensive depositions and discovery requests.  Mr. Rivero's assumptions and opinions on the same issues offer nothing more that what Plaintiffs have already alleged in their complaint.[41]  The court does not need a purported expert to simply restate the Plaintiffs' arguments.[42]  Allowing such

_____

[39]*See* FN 14, 15 and 16, *supra*.

[40]*Compare* Report at 19 *with* Oxentenko Dep. at 202 (large bonus not necessarily tied to keeping labor costs down; objective as crew leader is to work as much as possible and have labor costs in line with the work) and Eller and Sons Trees 2d Dep. at 50 (bonus system gives incentive to work harder, not falsify hours).

[41]Frazier, 387 F.3d at 1262-1263 ("[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments").

[42]A party is not entitled to have an expert testify solely because that witness can eloquently summarize the evidence; that is the job of counsel.  Rogers v.

testimony, which goes to the ultimate issue of liability, accords undue weight to Mr. Rivero's opinions. Courts regularly exclude expert testimony that is unreliable and cumulative of other evidence in the record since the triers of fact should be free to draw their own conclusions.[43] Likewise here, the triers of fact should be allowed to review the evidence in the case and make their own determinations regarding the accuracy of the records and the credibility of the witnesses.

### 3. Legal opinions are not proper in an expert report

As part of his analysis and conclusions regarding Defendants' payroll records

---

Raymark Industries, Inc., 922 F.2d 1426, 1429-1431 (9th Cir. 1991) (district court did not abuse its discretion in finding that expert testimony had only limited probative value that was substantially outweighed by being cumulative and misleading). In Rogers, the court held that the unavailability and lack of sophistication of some of the co-workers on the relevant working conditions did not automatically qualify the introduction of expert testimony. Id. In fact, the plaintiff had presented testimony bearing on the same point through other witnesses. Thus, the court determined that the danger that a jury would become "mesmerized" by the expert was sufficiently outweighed by any benefit from the cumulative and misleading testimony. Id. at 1431 ("Jurors may well assume that an expert, unlike an ordinary mortal, will offer an authoritative view on the issues addressed...and thus focus unduly on the expert's issues to the detriment of issues that are in fact controlling").

[43]Thomas, 205 Fed.Appx. at 773 (expert testimony excluded where his "conclusion could have been premised only upon information elsewhere available to the trier of fact, who would be free to draw similar or differing conclusions based upon the same evidence") (*citing* Benefit Ass'n of Ry. Employees v. Bell, 46 F.2d 225, 226 (5th Cir. 1931) ("[E]xpert evidence is not necessary where the facts proven are such as to enable ordinary men to reach a natural and intelligent conclusion by reasoning logically from cause to effect.")).

and recordkeeping methods, Mr. Rivero set forth the general recordkeeping requirements under the FLSA and AWPA. (Report at 4: cites §516.2(a)7 of the FLSA and §500.80(a) of the AWPA). Mr. Rivero concluded, based upon his limited examination of Defendants' records, that:

> "[t]he facts in this case clearly indicate that Defendants failed to meet their obligations under the FLSA and AWPA to keep an accurate records of the hours worked by the Plaintiffs and other workers." Report at 4;

> "[a]lthough rounding off to the nearest quarter hour is common in many industries and permissible under the FLSA, rounding off in this case, if being done at all apparently is to the nearest hour or half hour. This is not common practice and would not be permissible." Report at 7;

> and

> "[i]t is my opinion that Defendants failed to maintain and preserve an accurate record of the total daily and weekly hours worked by the Plaintiffs and other employees (as demonstrated above) as required by the record keeping provisions found at §516.2(a)7 of the FLSA and §500.80(a) of the AWPA...I am ready to testify, without hesitation that Defendants failed to meet their recordkeeping obligations under the FLSA and AWPA." Report at 22.

First, Defendants point out that Plaintiffs have not moved for summary judgment under the general recordkeeping requirements of the FLSA and have acknowledged that they do not have such a claim.[44] Consequently, any of Mr.

---

[44]Doc. 282 at 10 ("The Plaintiffs do not seek to assert a claim under the recordkeeping provisions of the FLSA...'Indeed, the FLSA lacks a private right of action to enforce its accurate recordkeeping requirements. Elwell v. University Hosps. Home Care Servs., 276 F.3d 832, 843 (6th Cir. 2002).'").

Rivero's statements and opinions regarding FLSA liability are completely irrelevant to the claims at issue in this case and inherently prejudicial.  As such, they should be stricken from his report.

More importantly, Mr. Rivero has presented pure legal conclusions which are not admissible as expert testimony.[45]  While an expert may testify as to his opinion on an ultimate issue of fact (*see* Fed.R.Evid. 704), an expert may not tell the jury what result to reach and cannot testify to the legal implications of certain conduct.[46]  Mr. Rivero's testimony not only attempted to define the legal principles at issue, but also rendered ultimate conclusions on one of the main issues of this case, namely that "Defendants failed to meet their recordkeeping obligations under the FLSA and

---

[45]*See* <u>Dubiel v. Columbia Hosp. (Palm Beaches) Ltd. Partnership</u>, 2005 WL 5955691, 4 (S.D.Fla. 2005) ("Generally, testimony that purports to offer legal opinions is properly excluded.") (*citing* <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2nd Cir. 1991) and <u>Specht v. Jensen</u>, 853 F.2d 805, 808 (10th Cir. 1988) (trial court improperly permitted expert to tell jury that defendants violated plaintiff's constitutional rights: "The courts ... draw a clear line between permissible testimony on issues of fact and testimony that articulates the ultimate principles of law governing the deliberations of the jury. [They] have decried the latter kind of testimony as directing a verdict, rather than assisting the jury's understanding and weighing of the evidence").

[46]<u>Montgomery v. Aetna Cas. & Sur. Co.</u>, 898 F.2d 1537, 1541 (11th Cir. 1990) (district court abused its discretion by allowing expert to provide legal conclusion: "the court must be the jury's only source of law") (*citations omitted*); *see also* <u>Bilzerian</u>, 926 F.2d at 1294 (expert testimony not permitted if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it").

AWPA." (Report at 22).

Mr. Rivero's testimony and expert report is very similar to another recent district court case involving the FLSA. In <u>Dubiel</u>, the court struck portions of an otherwise qualified expert who provided testimony asserting that defendant-employer's policies were in compliance with the FLSA for all relevant times and that any alleged violation of the FLSA could not be considered willful. <u>Dubiel</u>, 2005 WL 5955691 at 3. The court held that the expert report and proffered testimony were not admissible because they improperly invaded the province of the court and jury by evaluating the credibility of witnesses, weighing evidence, and drawing legal conclusions based upon the expert's own factual determinations. Id. at 4-5 (court also noted that expert did not bring any particular expertise to making the factual determinations and that the case did not present complex issues of fact which could not be evaluated by the trier of fact without expert assistance).[47] Similarly, in <u>Frazier</u>, while the court admitted expert testimony regarding the fact that no hair or fluid matching defendant was found on the scene, the expert's resulting conclusion that therefore there was no forensic evidence to substantiate the rape was excluded.

---

[47]The court did allow the expert to provide testimony on a factual matter (whether defendant's meal break policy and its implementation are a standard business practice) which he was qualified to opine upon and which was beyond the general knowledge of the trier of fact. <u>Dubiel</u>, 2005 WL 5955691 at 5.

-40-

<u>Frazier</u>, 387 F.3d at 1254-55 and 1264-66.[48]  Finally, where an expert opinion does not assist the trier of fact under Rule 702 and is not "otherwise admissible," Rule 704's provision that such testimony may "embrace[s] an ultimate issue to be decided by the trier of fact," does not apply.  <u>Dubiel</u>, 2005 WL 5955691 at 5 (*citations omitted*).

In this case, Mr. Rivero went beyond simply providing a factual analysis of Defendants' payroll records.  Rather, he weighed the credibility of the recordkeeping methods and hours reflected on Defendants' payroll records[49] and then asserted legal conclusions based upon his factual determinations.[50]  And as described in the

---

[48]*See also* <u>Shannon Produce Farms, Inc.</u>, 2007 WL 2106188, at 12-13 (pure legal arguments of expert report was stricken as not being helpful to jury; counsel could sufficiently raise such legal arguments on its own); <u>Cook</u>, 402 F.3d at 1113 (expert opinion that defendant violated constitutional right to be free from cruel and unusual punishment was purely legal conclusion and properly excluded).

[49]For example, Mr. Rivero asserted that it was "not believable" that Defendants would allow lost production time (Report at 6), that the crew leaders and regional directors were motivated to under-report hours to increase their earnings (Report at 19-20), that the crew would always work as much as possible and take short or no breaks (Report at 4 and 9), that it was "not normal" for variations in hours between the workers (Report at 4), that the start and end times on the daily sheets were "highly unlikely" (Report at 7), and that is "highly unusual" to have workers produce the same number of pieces in the same number of hours (Report at 8).

[50]Mr. Rivero set forth the legal standards of the FLSA and AWPA and concluded that Defendants violated the recordkeeping provisions by failing to accurately record the hours worked by their crews (Report at 4 and 22).  Mr. Rivero also made other conclusory and unsubstantiated statements regarding

preceding sections, many of Mr. Rivero's conclusions and opinions lack any factual

foundation and are based upon flawed and unreliable methodologies; thus fail to assist

the trier of fact.  By stepping over the line and rendering legal conclusions, Mr. Rivero

has improperly invaded the province of this Court and jury and such testimony should

be excluded from this case.

> ### D.   Any Probative Value Of Mr. Rivero's Testimony And Expert Report Is Substantially Outweighed By The Danger Of Unfair Prejudice

Mr. Rivero's expert report should also be excluded under Rule 403 because its

probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, misleading the jury, or needless presentation of cumulative

---

ultimate issues of this case: "The following describes the methods used by
Defendants to conceal the true hours worked by Plaintiffs" (Report at 4), "rounding
off in this case, if being done at all, apparently is to the nearest hour or half hour.
This is not common practice and would not be permissible [under FLSA]" (Report
at 7), "When no start or quit time was shown, Defendants would simply show a
lower number of hours worked" (Report at 5), "This would indicate that...long
lunch break was to conceal the time it took them to travel between or among
various fields" (Report at 10), similar piece rate production "indicative that
someone has determined how many hours should be shown...in order to comply
with the minimum wage or H-2B prevailing wage and/or to evade the overtime
provisions of the FLSA" (Report at 8), "Defendants frequently show unusually
long lunch breaks which are atypical of piece rate workers" (Report at 9), "obvious
that the number of hours worked shown is not accurate" (Report at 12), "changes
in the seedling planting rate...indicative that the seedling pick up times are not
accurate and have been manipulated" (Report at 17) and "alteration of the
hours...provides strong evidence that the Defendants intentionally set out to
conceal the hours worked" (Report at 19).

evidence.  Fed.R.Evid. 403.  As explained above, Mr. Rivero's opinions contained within his expert report are wholly unreliable and do not comport with the methodologies of his proffered experience.  As noted in <u>Frazier</u>, juries may place inordinate weight on the testimony of an expert witness and therefore courts must be careful to exclude such testimony which are unreliable and cumulative.  <u>Frazier</u>, 387 F.3d at 1263 ("Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").[51]  Likewise here, this Court should exercise its gatekeeping authority and its discretion to exclude Mr. Rivero's expert report as it provides unreliable and cumulative testimony which fails to assist the trier of fact.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants pray that its Motion to Strike Plaintiffs' Expert Witness Jorge Rivero and his corresponding Expert Witness Report be granted.

---

[51]*See also* <u>Thomas</u>, 205 Fed.Appx. at 773 ("The risk that these opinions would mislead the jury and unfairly prejudice the companies far exceeds any probative value, which we view as nil.") (*citing* Fed.R.Evid. 403); <u>Hull v. Merck & Co., Inc.</u>, 758 F.2d 1474, 1477 (11th Cir. 1985) (per curiam) (finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702"); <u>United States v. Stevens</u>, 935 F.2d 1380, 1399 (3d Cir. 1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence").

Respectfully submitted this 30th day of May, 2008.

    /s/ J. Larry Stine

Wimberly, Lawson, Steckel,    J. Larry Stine
Schneider & Stine, P.C.    Georgia Bar No. 682555
 Suite 400, Lenox Towers    Elizabeth K. Dorminey
3400 Peachtree Road, N.E.    Georgia Bar No. 225935
Atlanta, Georgia 30326    *Attorneys for Defendants*
(404) 365-0900
jls@wimlaw.com
bdorminy@bellsouth.net

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ESCOLASTICO DE LEON-GRANADOS, | * | |
| ISAIAS PROFETA | * | |
| DE LEON-GRANDADOS | * | |
| and ARMENIO PABLO-CALMO | * | |
| on behalf of themselves and all others | * | |
| similarly situated, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | CASE NO.: 1:05-CV-1473 |
| | * | |
| ELLER AND SONS TREES, INC. and | * | JURY DEMAND |
| JERRY ELLER | * | |
| | * | |
| Defendants. | * | |

## CERTIFICATE OF SERVICE AND TYPE SIZE COMPLIANCE

Pursuant to Local Rule 5.1C, ***Defendants' Motion and Memorandum in Support to Strike Plaintiffs' Expert Witness Jorge Rivero*** was prepared in Times New Roman, 14 point and I hereby certify that I have this date filed the foregoing electronically with the Clerk of Court using the CM/ECF system which will electronically mail a copy to all attorneys of record.

This 30th day of May, 2008.


    /s/ J. Larry Stine

Wimberly, Lawson, Steckel        J. Larry Stine
Schneider & Stine, P.C.            Ga. Bar No.: 682555
Suite 400, Lenox Towers           Elizabeth K. Dorminey
3400 Peachtree Road, N.E.       Ga. Bar No.: 225935
Atlanta, Georgia 30326            Attorneys for Defendants
(404)365-0900
Fax: (404)261-3707
jls@wimlaw.com
bdorminy@bellsouth.net